IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| William Carter, | ) | |
| | ) | |
| *Plaintiff* | ) | |
| | ) | No. _____ |
| *-vs-* | ) | |
| | ) | *(Jury Demand)* |
| City of Chicago, Ronald Watts, | ) | |
| Phillip Cline, Debra Kirby, Darryl | ) | |
| Edwards, Alvin Jones, Kallatt | ) | |
| Mohammed, John Rodriguez, | ) | |
| Calvin Ridgell, Jr., Elsworth J. | ) | |
| Smith, Jr., Gerome Summers, Jr., | ) | |
| and Kenneth Young, Jr., | ) | |
| | ) | |
| *Defendants* | ) | |

## COMPLAINT

Plaintiff, by counsel, alleges as follows:

### I.  Introduction

1.     Plaintiff William Carter is one of many victims of the criminal enterprise run by convicted felon and former Chicago Police Sergeant Ronald Watts and his tactical team at the Ida B. Wells Homes in the 2000's.

2.     The Watts Gang of officers engaged in robbery and extortion, used excessive force, planted evidence, fabricated evidence, and manufactured false charges.

3.     High ranking officials within the Chicago Police Department were aware of the Watts Gang's criminal enterprise, but failed to take any action to stop it.

4.     The Chicago Police Department's official policies or customs of failing to discipline, supervise, and control its officers, as well as its a "code of silence," were a proximate cause of the Watts Gang's criminal enterprise.

5.     The facts of this case provide a striking example of these official policies and customs and of the Watts Gang's criminal enterprise: Carter was falsely arrested and falsely charged by Watts and his Gang three times. Although Carter pleaded guilty to the first two false charges, he also filed formal contemporaneous complaints with the Chicago Police Department.

6.     In response to Carter's complaints, Watts and his Gang falsely arrested Carter a third time and again framed him for selling drugs. A jury convicted Carter based on the wrongful acts of officers in the Watts Gang and he received a nine-year sentence.

7.     As a result of these three wrongful convictions, Carter was wrongfully incarcerated for a total of more than four years between his nineteenth and twenty-fourth birthdays.

8.     Based on the powerful evidence that has become known about the Watts Gang's nearly decade-long criminal enterprise, on July 10, 2017,

the Circuit Court of Cook County granted the State's motion for a new trial and dismissed the charges against Carter in all three cases.

9.      On September 14, 2017, the Circuit Court of Cook County granted Carter certificates of innocence in all three cases.

10.     Carter brings this lawsuit to secure a remedy for his illegal incarceration, which was caused by: the Watts Gang officers, the failure of high-ranking officials within the Chicago Police Department to stop the Watts Gang, the code of silence within the Chicago Police Department, and the Chicago Police Department's defective discipline policy.

**II.     Parties and Jurisdiction**

11.     This is a civil action arising under 42 U.S.C. § 1983. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1343 and 1367.

12.     Plaintiff William Carter is a resident of the Northern District of Illinois.

13.     Defendant City of Chicago is an Illinois municipal corporation.

14.     Defendants Ronald Watts, Darryl Edwards, Alvin Jones, Kallatt Mohammed, John Rodriguez, Calvin Ridgell, Jr., Elsworth J. Smith, Jr., Gerome Summers, Jr., and Kenneth Young, Jr., (the "individual officer defendants"), were at all relevant times acting under color of their offices as Chicago police officers. Plaintiff sues the individual officer defendants in their individual capacities.

15.     Defendant Philip Cline was at all relevant times Superintendent of the Chicago Police Department. Plaintiff sues Cline in his individual capacity.

16.     Defendant Debra Kirby was at all relevant times the Assistant Deputy Superintendent of the Chicago Police Department, acting as head of the Chicago Police Department Internal Affairs Division. Plaintiff sues Kirby in her individual capacity.

### III.    The First False Arrest and Illegal Prosecution of Plaintiff

17.     On March 3, 2004, plaintiff was arrested by defendants Mohammed, Young, and Edwards (the "March 3, 2004 Arresting Officers") inside a building at the Ida B. Wells Homes.

18.     At the time of plaintiff's arrest on March 3, 2004:

a.  None of the March 3, 2004 Arresting Officers had a warrant authorizing the arrest of plaintiff;

b.  None of the March 3, 2004 Arresting Officers believed that a warrant had been issued authorizing the arrest of plaintiff;

c.  None of the March 3, 2004 Arresting Officers had observed plaintiff commit any offense; and

d.  None of the March 3, 2004 Arresting Officers had received information from any source that plaintiff had committed an offense.

19.     One or more of the March 3, 2004 Arresting Officers used excessive and unreasonable force while placing plaintiff under arrest.

20.     After arresting plaintiff, the March 3, 2004 Arresting Officers conspired, confederated, and agreed to fabricate a false story in an attempt to justify the unlawful arrest, to cover-up their wrongdoing, and to cause plaintiff to be wrongfully detained and prosecuted.

21.     The false story fabricated by the March 3, 2004 Arresting Officers included their false claim that they had arrested plaintiff after seeing him with a clear plastic bag containing drugs.

22.     The acts of the March 3, 2004 Arresting Officers in furtherance of their scheme to frame plaintiff included the following:

        a.  One or more of the March 3, 2004 Arresting Officers prepared police reports containing the false story, and the others each failed to intervene to prevent the violation of plaintiff's rights;

        b.  One or more of the March 3, 2004 Arresting Officers attested through the official police reports that they witnessed the false story, and the others each failed to intervene to prevent the violation of plaintiff's rights;

c. Defendant Watts formally approved the official police reports, knowing that they contained the false story; and

d. One or more of the March 3, 2004 Arresting Officers communicated the false story to prosecutors, and the others each failed to intervene to prevent the violation of plaintiff's rights.

23.     Each of the wrongful acts of the March 3, 2004 Arresting Officers was performed with knowledge that the acts would cause plaintiff to be wrongfully held in custody and falsely prosecuted for an offense that had never occurred.

24.     On March 8, 2004, five days after his first false arrest, plaintiff made a formal complaint to the Chicago Police Department about the wrongful acts of the March 3, 2004 Arresting Officers.

25.     Defendants Mohammed, Edwards, and Young all made false statements as part of the Department's investigation into plaintiff's complaint.

26.     As a result of these false statements, the Department found plaintiff's complaint to be "Not Sustained."

27.     Plaintiff was charged with possession of a controlled substance in Case Number 04-CR-09579 as a result of the wrongful acts of the March 3, 2004 Arresting Officers.

28.     Plaintiff was detained before trial as a result of the wrongful acts of the March 3, 2004 Arresting Officers; this detention including being confined at the Cook County Jail beginning on May 12, 2005.

29.     Plaintiff knew that proving that the March 3, 2004 Arresting Officers had concocted the charges against him would not be possible.

30.     Accordingly, even though he was innocent, plaintiff, pleaded guilty in Case Number 04-CR-09579 on July 8, 2005, and was sentenced to the Cook County Department of Corrections Boot Camp Program.

31.     Plaintiff's sentence require him to remain in custody at the Cook County Jail for over six months.

32.     As a result of the above-described wrongful acts of the March 3, 2004 Arresting Officers, plaintiff was deprived of rights secured by the Fourth and Fourteenth Amendments to the Constitution of the United States while being held as a pre-trial detainee and while serving his sentence.

**IV.     The Second False Arrest and Illegal Prosecution of Plaintiff**

33.     On June 18, 2004, plaintiff was arrested by defendants Mohammed, Jones, Edwards, Young, Rodriguez, Summers, Ridgell, and

Watts (the "June 18, 2004 Arresting Officers") inside a building at the Ida
B. Wells Homes.

34.     At the time of plaintiff's arrest on June 18, 2004:

a.  None of the June 18, 2004 Arresting Officers had a warrant
authorizing the arrest of plaintiff;

b.  None of the June 18, 2004 Arresting Officers believed that a
warrant had been issued authorizing the arrest of plaintiff;

c.  None of the June 18, 2004 Arresting Officers had observed
plaintiff commit any offense; and

d.  None of the June 18, 2004 Arresting Officers had received
information from any source that plaintiff had committed an
offense.

35.     One or more of the June 18, 2004 Arresting Officers used
excessive and unreasonable force while placing plaintiff under arrest.

36.     After arresting plaintiff, the June 18, 2004 Arresting Officers
conspired, confederated, and agreed to fabricate a false story in an attempt
to justify the unlawful arrest, to cover-up their wrongdoing, to retaliate
against plaintiff for filing a formal complaint, and to cause plaintiff to be
wrongfully detained and prosecuted.

37.     The false story fabricated by the June 18, 2004 Arresting Officers included their false claim that that they had arrested plaintiff after seeing him with a clear plastic bag containing drugs.

38.     The acts of the June 18, 2004 Arresting Officers in furtherance of their scheme to frame plaintiff included the following:

    a.  One or more of the June 18, 2004 Arresting Officers prepared police reports containing the false story, and the others each failed to intervene to prevent the violation of plaintiff's rights;

    b.  One or more of the June 18, 2004 Arresting Officers attested through the official police reports that they were witnesses to the false story, and the others each failed to intervene to prevent the violation of plaintiff's rights;

    c.  Defendant Watts formally approved the official police reports, knowing that they contained the false story; and

    d.  One or more of the June 18, 2004 Arresting Officers communicated the false story to prosecutors, and the others each failed to intervene to prevent the violation of plaintiff's rights.

39.     Each of the wrongful acts of the June 18, 2004 Arresting Officers was performed with knowledge that the acts would cause plaintiff to be wrongfully held in custody and falsely prosecuted for an offense that had never occurred.

40.     On July 1, 2004, thirteen days after his second false arrest, plaintiff made a formal complaint to the Chicago Police Department about the wrongful acts of the June 18, 2004 Arresting Officers.

41.     Defendants Mohammed, Edwards, and Jones all made false statements as part of the Department's investigation into plaintiff's second complaint.

42.     As a result of these false statements, the Department again found plaintiff's complaint to be "Not Sustained."

43.     Plaintiff was charged with possession of a controlled substance in Case Number 04-CR-17677 as a result of the wrongful acts of the June 18, 2004 Arresting Officers.

44.     Plaintiff was detained before trial as a result of the wrongful acts of the March 3, 2004 Arresting Officers; this detention including being confined at the Cook County Jail beginning on May 12, 2005. This detention was concurrent with plaintiff's detention awaiting trial in Case Number 04-CR-09579

45.     Plaintiff knew that proving that the June 18, 2004 Arresting Officers had concocted the charges against him would not be possible.

46.     Accordingly, even though he was innocent, plaintiff pleaded guilty in Case Number 04-CR-17677 on July 8, 2005, and was sentenced to the Cook County Department of Corrections Boot Camp Program. The sentence was concurrent with plaintiff's sentence in Case Number 04-CR-09579.

47.     Plaintiff's sentence required him to remain in custody at the Cook County Jail for more than six months.

48.     As a result of the above-described wrongful acts of the June 18, 2004 Arresting Officers, plaintiff was deprived of rights secured by the Fourth and Fourteenth Amendments to the Constitution of the United States while being held as a pre-trial detainee and while serving his sentence.

### V.     The Third False Arrest and Illegal Prosecution of Plaintiff

49.     In May 2006, plaintiff was living at 527 East Browning, Apartment 506 in the Ida B. Wells Homes.

50.     In the evening of May 19, 2006, plaintiff returned to his apartment from another apartment (number 608) in the building.

51.     Damica Nickerson lived in apartment 608 and sold food out of her apartment; plaintiff had been at Nickerson's apartment to order an Italian beef sandwich.

52.     After ordering the sandwich, plaintiff returned to his apartment, one floor below, where he encountered Defendant Jones, who had unlawfully entered and searched the apartment.

53.     Jones was leaving the apartment when plaintiff entered.

54.     As plaintiff entered the apartment, defendant Jones told him "You're just the motherfucker I'm looking for."

55.     Defendant Jones placed plaintiff in handcuffs and walked him into the hallway where defendant Mohammed joined them.

56.     Defendant Jones did not have any lawful basis to handcuff plaintiff.

57.     Defendant Mohammed knew that Defendant Jones did not have any lawful basis to handcuff plaintiff and could have, but did not, intervene to prevent the violation of plaintiff's rights;

58.     Jones and Mohammed then walked plaintiff down the stairs to the first floor of 527 East Browning.

59.     There, other members of the Watts Gang, including defendants Young and Smith, joined Jones, Mohammed, and plaintiff.

60.     While plaintiff, still in handcuffs, sat on the stairs in the first-floor hallway of 527 East Browning, defendants Jones, Mohammed, Young, and Smith (the "May 19, 2006 Arresting Officers") arrested Sandra Berry.

61.     Plaintiff had never seen Berry before and had not had any contact with her arrest.

62.     The May 19, 2006 Arresting Officers took plaintiff and Berry to the police station, where plaintiff learned for the first time that he was being charged for possession and sale of drugs.

63.     At the time of plaintiff's arrest on May 19, 2006:

   a.   None of the May 19, 2006 Arresting Officers had a warrant authorizing the arrest of plaintiff;

   b.   None of the May 19, 2006 Arresting Officers believed that a warrant had been issued authorizing the arrest of plaintiff;

   c.   None of the May 19, 2006 Arresting Officers had observed plaintiff commit any offense; and

   d.   None of the May 19, 2006 Arresting Officers had received information from any source that plaintiff had committed an offense.

64.     One or more of the May 19, 2006 Arresting Officers used excessive and unreasonable force while placing plaintiff under arrest.

-13-

65.     After arresting plaintiff, the May 19, 2006 Arresting Officers conspired, confederated, and agreed to fabricate a false story in an attempt to justify the unlawful arrest, to cover-up their wrongdoing, to retaliate against plaintiff for filing formal complaints, and to cause plaintiff to be wrongfully detained and prosecuted.

66.     The false story fabricated by the May 19, 2006 Arresting Officers included their false claim that they arrested plaintiff after seeing him sell drugs to Berry and that they then found drugs on plaintiff's person.

67.     The acts of the May 19, 2006 Arresting Officers in furtherance of their scheme to frame plaintiff included the following:

> a.  One or more of the May 19, 2006 Arresting Officers prepared police reports containing the false story, and the others each failed to intervene to prevent the violation of plaintiff's rights;
>
> b.  One or more of the May 19, 2006 Arresting Officers attested through the official police reports that they were witnesses to the false story, and the others each failed to intervene to prevent the violation of plaintiff's rights;
>
> c.  Defendant Watts formally approved the official police reports, knowing that they contained the false story; and

d. One or more of the May 19, 2006 Arresting Officers communicated the false story to prosecutors, and the others each failed to intervene to prevent the violation of plaintiff's rights.

68. Each of the wrongful acts of the May 19, 2006 Arresting Officers was performed with knowledge that the acts would cause plaintiff to be wrongfully held in custody and falsely prosecuted for an offense that had never occurred.

69. Plaintiff was charged with sale and possession of a controlled substance in Case Number 06-CR-13571 of the wrongful acts of the May 19, 2006 Arresting Officers.

70. Plaintiff was continuously confined awaiting trial in Case Number 06-CR-13571.

71. At trial, defendant Smith and Jones testified falsely in furtherance of the conspiracy.

72. Plaintiff presented witnesses who testified to his innocence, but a jury convicted him on February 1, 2007, and he received a sentence of 9 years of imprisonment.

73. Plaintiff was continuously confined after trial until he was released on parole on January 21, 2010.

74.     As a result of the above-described wrongful acts of the May 19, 2006 Arresting Officers, plaintiff was deprived of rights secured by the Fourth and Fourteenth Amendments to the Constitution of the United States while being held as a pre-trial detainee and while serving his sentence.

## VI.     Plaintiff's Exonerations

75.     Plaintiff challenged his convictions after he learned that federal prosecutors and lawyers for other wrongfully convicted individuals had uncovered evidence of the Watts Gang's criminal enterprise.

76.     On July 10, 2017, the Circuit Court of Cook County granted the State's motion to set aside plaintiff's convictions in all three cases; immediately thereafter, the Court granted the State's request to *nolle prosequi* the case.

77.     On September 14, 2017, the Circuit Court of Cook County granted plaintiff certificates of innocence in all three cases.

## VII.    Plaintiff's Arrest and Prosecution Were Part of a Long-Running Pattern Known to High Ranking Officials within the Chicago Police Department

78.     Before the Watts Gang engineered plaintiff's above-described wrongful arrests, detentions, and prosecutions, the Chicago Police Department had received numerous civilian complaints that defendant Watts and the Watts Gang were engaging in robbery, extortion, the use of

excessive force, planting evidence, fabricating evidence, and manufacturing false charges against persons at the Ida B. Wells Homes.

79.     Criminal investigators corroborated these civilian complaints with information they obtained from multiple cooperating witnesses.

80.     Before the Watts Gang engineered plaintiff's above-described wrongful arrests, detentions, and prosecutions, defendants Cline and Kirby knew about the above-described credible allegations of serious wrongdoing by Watts and the Watts Gang and knew that criminal investigators had corroborated these allegations.

81.     Defendants Cline and Kirby also knew, before the Watts Gang engineered plaintiff's above-described wrongful arrests, detentions, and prosecutions, that, absent intervention by the Chicago Police Department, Watts and his gang would continue to engage in robbery and extortion, use excessive force, plant evidence, fabricate evidence, and manufacture false charges.

82.     The Internal Affairs Division of the Chicago Police knew about the lawlessness of Watts and his gang by 2004.

83.     Defendants Cline and Kirby had the power and the opportunity to prevent Watts and his gang from continuing to engage in the above-described wrongdoing.

84.     Defendants Cline and Kirby deliberately chose to turn a blind eye to the pattern of wrongdoing by Watts and his gang.

85.     As a direct and proximate result of the deliberate indifference of defendants Cline and Kirby, Watts and his gang continued to engage in robbery and extortion, use excessive force, plant evidence, fabricate evidence, and manufacture false charges against persons at the Ida B. Wells Homes, including but not limited to the wrongful arrests, detentions, and prosecutions of plaintiff, as described above.

## VIII. Official Policies and Customs of the Chicago Police Department Were the Moving Force behind the Defendants' Misconduct

86.     At all relevant times, the Chicago Police Department maintained official policies and customs that facilitated and condoned the Defendants' misconduct.

### A. Failure to Discipline

87.     At all relevant times, the Chicago Police Department maintained a policy or custom of failing to discipline, supervise, and control its officers. By maintaining this policy or custom, the City caused its officers to believe that they could engage in misconduct with impunity because their actions would never be thoroughly scrutinized.

88.     Before plaintiff's arrests, policymakers for the City of Chicago knew that the Chicago Police Department's policies or customs for

disciplining, supervising, and controlling its officers were inadequate and caused police misconduct.

89.     Despite their knowledge of the City's failed policies and customs for disciplining, supervising, and controlling its officers, the policymakers failed to take action to remedy these problems.

90.     Before the Watts Gang engineered plaintiff's above-described wrongful arrests, detentions, and prosecutions, all of the individual officer defendants had been the subject of formal complaints of official misconduct.

91.     Defendants Watts, Jones, and Young had each been the subject of more than fifteen formal complaints of official misconduct.

92.     As a direct and proximate result of the Chicago Police Department's inadequate policies or customs for disciplining, supervising, and controlling its officers and the policymakers' failure to address these problems, Watts and his gang continued to engage in robbery and extortion, use excessive force, plant evidence, fabricate evidence, and manufacture false charges against persons at the Ida B. Wells Homes, including but not limited to the wrongful arrests, detentions, and prosecutions of plaintiff, as described above.

### B. Code of Silence

93.     At all relevant times, the Chicago Police Department maintained a "code of silence" that required police officers to remain silent

about police misconduct. An officer who violated the code of silence would be severely penalized by the Department.

94.     At all relevant times, police officers were trained at the Chicago Police Academy not to break the code of silence. Officers were instructed that "Blue is Blue. You stick together. If something occurs on the street that you don't think is proper, you go with the flow. And after that situation, if you have an issue with that officer or what happened, you can confront them. If you don't feel comfortable working with them anymore, you can go to the watch commander and request a new partner. But you never break the code of silence."

95.     This "code of silence" facilitated, encouraged, and enabled the individual officer defendants to engage in egregious misconduct for many years, knowing that their fellow officers would cover for them and help conceal their widespread wrongdoing.

96.     Consistent with this "code of silence," the few people within the Chicago Police Department who stood up to Watts and his gang or who attempted to report their misconduct were either ignored or punished, and the Watts Gang was thereby able to engage in misconduct with impunity.

97.     Watts and his gang are not the first Chicago police officers whom the City of Chicago allowed to abuse citizens with impunity while the City turned a blind eye.

98.     One example of this widespread practice is Chicago police officer Jerome Finnigan, who was convicted and sentenced on federal criminal charges in 2011. One of the charges against Finnigan involved his attempt to hire a hitman to kill a police officer whom Finnigan believed would be a witness against him.

99.     Finnigan was part of a group of officers in the Defendant City's Special Operations Section who carried out robberies, home invasions, unlawful searches and seizures, and other crimes.

100.    Finnigan and his crew engaged in their misconduct at around the same time that plaintiff was subjected to the abuses described above.

101.    Finnigan, like the defendants in this case, had been the subject of many formal complaints of misconduct.

102.    Finnigan revealed at his criminal sentencing hearing in 2011, "You know, my bosses knew what I was doing out there, and it went on and on. And this wasn't the exception to the rule. This was the rule."

103. Defendants Watts and Mohammed were criminally charged in federal court in February 2012 after shaking down a federal informant they believed was a drug dealer.

104. Defendant Mohammed pleaded guilty in 2012.

105. Defendant Watts pleaded guilty in 2013.

106. In the case of *Obrycka v. City of Chicago et al.*, No. 07-cv-2372 (N.D. Ill.), a federal jury found that as of February 2007, "the City [of Chicago] had a widespread custom and/or practice of failing to investigate and/or discipline its officers and/or code of silence."

107. In December 2015, Chicago Mayor Rahm Emanuel acknowledged the continued existence of the code of silence within the Chicago Police Department; Emanuel, speaking in his capacity as Mayor, admitted that the code of silence leads to a culture where extreme acts of abuse are tolerated.

108. In April 2016, the City's Police Accountability Task Force found that the code of silence "is institutionalized and reinforced by CPD rules and policies that are also baked into the labor agreements between the various police unions and the City."

109.    In an official government report issued in January 2017, the United States Department of Justice found that "a code of silence exists, and officers and community members know it."

110.    The same code of silence in place during the time period at issue in the *Obrycka* case and recognized by the Mayor, the Task Force, and the Department of Justice was also in place when plaintiff suffered the wrongful arrests, detentions, and prosecutions described above.

111.    As a direct and proximate result of the City's code of silence, Watts and his gang continued to engage in robbery and extortion, use excessive force, plant evidence, fabricate evidence, and manufacture false charges against persons at the Ida B. Wells Homes, including but not limited to the wrongful arrests, detentions, and prosecutions of plaintiff, as described above.

## IX.    Claims

112.    As a result of the foregoing, all of the defendants caused plaintiff to be deprived of rights secured by the Fourth and Fourteenth Amendments.

113.    As a supplemental state law claim against defendant City of Chicago only: as a result of the foregoing, plaintiff was subjected to three malicious prosecutions under Illinois law.

114.    Plaintiff hereby demands trial by jury.

WHEREFORE plaintiff requests that appropriate compensatory and punitive damages be awarded against the individual defendants and that appropriate compensatory damages only be awarded against defendant City of Chicago, and that the Court award fees and costs against defendants.

/s/  Joel A. Flaxman
Joel A. Flaxman
ARDC No. 6292818
Kenneth N. Flaxman
KENNETH N. FLAXMAN P.C.
200 S Michigan Ave, Ste 201
Chicago, IL 60604
(312) 427-3200
jaf@kenlaw.com
*attorneys for plaintiff*